**v.**

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.**

**C.K., Appellant,**

**v.**

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.**

**Nos. S–7436, S–7446.**

Supreme Court of Alaska.

Jan. 31, 1997.

Bethany P. Spalding, Assistant Public Defender, Fairbanks, and John B. Salemi, Public Defender, Anchorage, for Appellant O.R.

Robert S. Noreen and Michelle McComb, Law Offices of Robert S. Noreen, Fairbanks, for Appellant C.K.

D. Rebecca Snow, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

*OPINION*

FABE, Justice.

I. *INTRODUCTION*

C.K., the mother, and O.R., the father, appeal the termination of their parental rights over A.R., their daughter. C.K. and

O.R. challenge the superior court's finding that they abandoned A.R. They also argue that the court, in determining A.R. to be a child in need of aid, failed to consider adequately that they and two of C.K.'s relatives are willing to care for her. In addition, C.K. disputes the court's findings that her harmful conduct toward A.R. is likely to continue and that the Department of Health and Social Services (DHSS) made reasonable efforts at reunifying her with A.R.

## II. *FACTS AND PROCEEDINGS*

A.R. was born nine weeks prematurely on June 11, 1994. She tested positive for cocaine and suffered from respiratory difficulties, including strep pneumonia. Because of her health problems, she remained in the hospital's neo-natal intensive care unit until July 5, 1994, and required hospitalization three more times in the next four months. A year after her birth, A.R. underwent surgery to correct her breathing difficulties. The surgery minimized most of her respiratory problems, but she remains vulnerable to serious illness and attention disorders.

A.R. is C.K.'s eighth child. The two children born to C.K. prior to A.R. also tested positive for cocaine at birth. DHSS removed all of C.K.'s other children in 1991 and 1992 and placed them under the guardianship of relatives in other states. O.R. has two other children who live with their mother in another state. O.R. and C.K. are not married.

DHSS initially took emergency custody of A.R. on June 13, 1994, two days after her birth, because she tested positive for cocaine. On June 15, 1994, in response to a petition by DHSS, C.K. and O.R. stipulated to ninety days temporary custody with the state. The court extended custody at a review hearing on September 13, 1994, until a trial on November 28, 1994, on DHSS's petition for adjudication of A.R. as a child in need of aid (Adjudication Trial).

There was little visitation between A.R. and her parents in the more than five months between A.R.'s birth and the adjudication trial. Although C.K. and O.R. appear to have visited the child regularly during the three weeks that she remained in the hospital after her birth, their visits almost entirely ceased after she was discharged. Between July 5 and November 28, C.K. visited only twice, once in July and once in September, and O.R. visited only once, accompanying C.K. on the July visit.

In its findings and order following the November 28, 1994 trial, the superior court stated that it found this "lack of visitation by either parent ... troubling because it means that neither of them could possibly have established a relationship with A.R. with so little contact." The court further noted A.R.'s "special medical needs which require careful attention and care from her primary care takers" and stated that "[n]either [C.] K. or [sic][O.] R. is capable of providing that level of attention and care at this time."

Based on these findings, the court determined that A.R. was a child in need of aid "in that she has no one able or willing to care for her at this time and she has effectively been abandoned, whether or not her parents' abandonment of her was conscious or intended." The court awarded custody of A.R. to DHSS for one year. In its order, the court stated that "[i]t is essential that each parent get treatment for his or her own needs as soon as possible and begin to establish contact with the child so that they can learn what her needs are and how to provide for them." Furthermore, a stipulation signed by O.R. and given to C.K.'s attorney stated that DHSS would "consider filing a petition to terminate parental rights" if C.K. and O.R. had not made "progress toward being able to demonstrate [they are] capable of caring for" A.R.

Despite this warning, however, C.K. did not visit A.R. in the next five months. She also failed to follow through on a recommendation to obtain treatment for her substance abuse problem. On April 29, 1995, C.K. was arrested for violation of probation and selling cocaine. At the time of the termination trial she was incarcerated and awaiting sentencing.

Shortly after the adjudication trial, O.R. was arrested and incarcerated until February 5, 1995. While in jail, he had one visit with A.R. in January 1995. After his release from jail, however, he did not visit A.R. until

he was again incarcerated in May 1995 on charges of sexual abuse of a minor, distributing alcohol to a minor, and misconduct involving weapons.

There were occasional obstacles to visitation during the time between A.R.'s initial discharge from the hospital and the time at which both parents were incarcerated. Between December 6 and December 20, C.K.'s social worker was on leave, and between December 16 and January 1, A.R. left the state with her foster parent. DHSS also canceled several visits in January for reasons beyond C.K. and O.R.'s control. This left, however, approximately seventy-seven scheduled visits that C.K. missed when she was not in jail and about seventy scheduled visits O.R. missed when he was not in jail.

In the five months after they were both incarcerated, C.K. and O.R. each had three visits with A.R. Bureaucratic delays, A.R.'s surgery in June, and a trip to Florida with her foster parents apparently made it impossible for A.R. to visit the jail more frequently.

On June 1, 1995, DHSS filed a Petition for Termination of Parental Rights, alleging abandonment. After a five-day trial beginning October 30, 1995, Judge Mary E. Greene terminated the parental rights of C.K. and O.R. and placed A.R. in the custody of DHSS for the purpose of finding her a permanent home. C.K. and O.R. appeal.

## III. *DISCUSSION* [1]

### A. *Did the Superior Court Err in Determining that A.R. Is a Child in Need of Aid Under AS 47.10.010(a)(2)?*

#### 1. *The superior court properly found that C.K. and O.R. physically abandoned A.R.*

To terminate parental rights under AS 47.10.080(c)(3),[2] a court must first establish jurisdiction over the child by determining that the child is a "child in need of aid" (CINA) under AS 47.10.010(a)(2).[3] *E.J.S. v. Department of Health & Social Servs.*, 754 P.2d 749, 750 (Alaska 1988). In this case, the court concluded that it possessed CINA jurisdiction over A.R. under the "physical abandonment" provision of AS 47.10.010(a)(2)(A). C.K. and O.R. both challenge this determination.

The test for physical abandonment under subsection (A) is "two-pronged: the superior court must find (1) that the parent's conduct implied a conscious disregard for parental obligations; and (2) that the parent's conscious disregard led to the destruction of the relationship between the parent

1. In reviewing the trial court's factual findings on the issue of termination of parental rights, we apply the "clearly erroneous" standard of review. *A.M. v. State*, 891 P.2d 815, 820 (Alaska 1995), *overruled in part by*, *In re S.A.*, 912 P.2d 1235 (Alaska 1996). Determinations of law are reviewed *de novo*. *In re S.A.*, 912 P.2d 1235, 1237 (Alaska 1996).

2. AS 47.10.080(c) provides:

(c) If the court finds that the minor is a child in need of aid it shall

. . . .

(3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, and the department or guardian shall report annually to the court on efforts being made to find a permanent placement for the child.

3. Pursuant to a 1996 amendment that deleted AS 47.10.010(a)(1), subsections (a)(2)(A–F) are now designated as AS 47.10.010(a)(1–6). Ch. 59, § 17, SLA 1996.

The section provided in relevant part:

(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter ... when the court finds the minor

. . . .

(2) to be a child in need of aid as a result of

(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by

(i) both parents,

(ii) the surviving parent, or

(iii) one parent if the other parent's rights and responsibilities have been terminated ... or voluntarily relinquished....

and the parent's children." *A.M.*, 891 P.2d at 820. The first prong of this test

> focuses on the objective conduct of the parents in discharging their parental responsibility. Thus, abandonment is not determined by the parent's subjective intent or on the parent's wishful thoughts and hopes for the child.... One's parental duty is an affirmative duty ... which requires a continuing interest in the child and a genuine effort to maintain communication and association with the child.

*Id.* (citations omitted). In *E.J.S.*, we further stated that "[t]oken efforts by a parent to communicate with his or her child are insufficient to satisfy this parental duty." 754 P.2d at 751. In *D.E.D. v. State,* 704 P.2d 774, 783 (Alaska 1985), we held that a mother consciously disregarded her parental obligations when she spent a total of "a little over two hours" with her child in an eight month period while the child was in the custody of the state.

In finding that C.K. and O.R. showed a conscious disregard for their parental obligations, the superior court focused on their failure to visit A.R. "frequently or consistently." The court looked especially to their conduct during the period before they were both incarcerated,[4] characterizing their efforts at visitation as "abysmal." It found that in the nine months following A.R.'s discharge from the hospital in July 1994, C.K. visited her twice. During that same period, O.R. also visited twice, once with C.K. in July 1994 and once during his incarceration from November 1994 to February 1995. Neither C.K. nor O.R. disputes the accuracy of these findings.

O.R. explains his lack of visits by relying on his need to spend time "establishing a stable and healthful lifestyle, particularly one with some financial stability," his desire to be "supportive of C.K. and getting things set up for A.R. at home," and on "personal difficulties [with C.K.]." The trial court found these reasons unconvincing. It stated that O.R. "never had any good explanation for his failure to play a role in A.R.'s life" and that he "consistently put other things above his child, such as wanting to work, his anger at [C.] K. and his criminal conduct." It found that "[t]hese choices reflect a pattern in [O.]R.'s life."

C.K. blames her lack of visits on several factors. She complains that "[v]isitations were canceled because A.R. was ill or out of state." C.K. also testified that "transportation problems" prevented her from visiting. The superior court rejected these excuses, finding that C.K.'s failure to maintain contact with A.R. was due to her substance abuse problem. It found that, despite being "repeatedly advised of the importance of visiting A.R.," when C.K. was not in jail, she never showed "a real interest" in A.R.

C.K. and O.R. received clear warnings that their failure to visit might result in loss of their parental rights. They were informed by the superior court at the temporary custody hearing in June 1994 and at the adjudication trial in November 1994 that regular visits with A.R. were very important "if they're ever going to parent this child." Indeed, at the adjudication trial and in the stipulation signed by O.R., DHSS clearly stated its intention to file a petition to terminate their parental rights if they did not demonstrate their commitment to caring for A.R.

Given this record, we hold that the trial court's finding that C.K. and O.R. showed conscious disregard for their parental obligations was not clearly erroneous. The record demonstrates that C.K. and O.R. did not make a "genuine effort to maintain communication and association" consistent with a parent's affirmative duty. *A.M.*, 891 P.2d at 820. Rather, their visits and other activities were only "token efforts" that were "insufficient to satisfy" that obligation. *E.J.S.*, 754 P.2d at 751.

4. This court has "suggested that incarceration cannot in itself constitute physical abandonment because it does not involve willful conduct." *A.M.*, 891 P.2d at 820 n. 5 (citing *Nada A. v. State*, 660 P.2d 436, 439 (Alaska 1983)). In response to *A.M.* and *Nada A.*, the legislature recently amended AS 47.10.080 to add a new subsection effective June 21, 1996, that provides a statutory basis for making incarceration a factor that can be considered in termination proceedings concerning children in need of aid. Ch. 89, SLA 1996.

■ The second prong of the abandonment test requires the court to determine that the parent's disregard "has caused a destruction of the parent-child relationship." *A.M.*, 891 P.2d at 821. The superior court found that "[n]o parent-child relationship now exists between A.R. and either parent, and that relationship had been destroyed by the conduct of O.R. and C.K. well before either of them went to jail." In reaching this conclusion, the trial court relied primarily on the testimony of the social worker responsible for the case and the testimony of C.K. and O.R. themselves.

The social worker testified that she did not believe that A.R. "has any attachment [to her parents] other than [as] someone she comes to visit." She based this belief on her observation that A.R. stayed close to her at the beginning of visits and that A.R. was "very careful about watching" her "to be sure that [the social worker was] still in the room or that A.R. c[ould] still see her." She also testified that A.R. showed "no great sign of recognition on her face" when meeting her parents. The trial court concluded that, from A.R.'s perspective, C.K. and O.R. are "strangers."

This conclusion was not contradicted by the parents' testimony at trial. O.R. acknowledged that he had no concrete evidence that A.R. knew who he was and that "she isn't really familiar with me." C.K. admitted that there was no attachment or bond between her and A.R. In addition to this testimony, we note that the lack of visitation by C.K. and O.R. took place during the first months of A.R.'s life. As an expert witness testified at the termination trial, contact between the parent and child is "the number one critical thing that happens in the first several months of life and probably is what future relationships are dependent upon." *See D.E.D.*, 704 P.2d 774, 783 (Alaska 1985) (noting that, "because of [child's] age," "lack of contact" between first and ninth month of child's life "had destroyed the parent-child bond").

In light of the foregoing, we conclude that the superior court did not err in determining that the parent-child bond between A.R. and her parents was destroyed by their failure to maintain contact with her during the first ten months of her life. Therefore, we affirm the court's ruling that C.K. and O.R. physically abandoned A.R. under AS 47.10.010(a)(2)(A).

2. *Did the superior court adequately consider whether A.R. has a parent or relative willing to provide care for her?*

■ C.K. and O.R. next argue that a court may assert CINA jurisdiction under AS 47.10.010(a)(2)(A) only if no parent, relative, custodian, or guardian is willing to care for the child. Relying on *In re S.A.*, 912 P.2d 1235 (Alaska 1996), they contend that even if they abandoned A.R., the court erred in finding that she is a child in need of aid because they and two of C.K.'s relatives are willing to care for her.

DHSS, on the other hand, argues that a finding of "physical abandonment" provides an independent basis for CINA jurisdiction, regardless of whether a parent or relative is willing to provide care for the child. DHSS urges us to interpret the abandonment clause in subsection (A) of AS 47.10.010(a)(2) as if it were a separate subsection like subsections B through F.

We disagree with the interpretation of subsection (A) suggested by DHSS. The legislature's use of the word "including" to join the "physical abandonment" clause with the rest of the subsection indicates that it considered abandonment to be one example of the failure or lack of willingness to provide care that is the focus of the subsection. *See In re S.A.*, 912 P.2d at 1241; *see also id.* at 1245 n. 3 (Eastaugh, J., dissenting) (stating that subsection (A) uses the word "including" to introduce physical abandonment as one circumstance in which there is no eligible person caring or willing to provide care for the child). Furthermore, the legislature's placement of the abandonment provision in the same subsection as the "caring or willing to provide care" clause rather than in a separate subsection strongly suggests that the two provisions should be read in conjunction rather than independently.[5]

5. This interpretation is strengthened by comparing subsection (A) with former AS 47.10.390(2).

DHSS argues that the reference to a "parent, guardian, custodian, or relative" who is "caring or willing to provide care" in subsection (A) does not fit completely with the emphasis on parental conduct in the abandonment provision of that subsection. DHSS also points out that under previous versions of Title 47 abandonment formed an independent basis for assertion of jurisdiction over the child and for termination of parental rights. *See* Ch. 40, § 1, SLA 1967 (former 47.10.080(c)(3)(B)); Ch. 145, art. I, § 4 SLA 1957 (former AS 47.10.010(a)(4)). These considerations, however, do not provide a sufficient basis for us to ignore the current language and structure of the abandonment provision and construe it as independent from the rest of subsection (A). Rather, we conclude that subsection (A) is better harmonized with the balance of the section by reading the abandonment provision as subsidiary to the "caring or willing to provide care" clause.

DHSS argues that this conclusion allows a parent to "defeat" a finding of physical abandonment "by mere words." It states that "[u]nder *S.A.*, [AS 47.10.010(a)(2) ](A) now applies only to that rare child who has no adult in her life who can, on advice of counsel, make the minimal gesture of somehow communicating to the court, 'I am willing to care for this child.'" We disagree with DHSS's characterization of our holding in *S.A.* We held in that case only that "a child may not be adjudicated CINA under AS 47.10.010(a)(2)(A) on the grounds that the child's parent or caregiver is unable to care for the child if the parent or caregiver is willing to care for the child." *S.A.*, 912 P.2d at 1242. Thus, *S.A.* simply forbids the court to consider ability in determining an individual's willingness to care. 912 P.2d at 1242. There is nothing in our opinion in *S.A.* that prohibits a court, when assessing the willingness of an individual to provide care for a child, from looking at actions or other objective criteria as well as "mere words."

Therefore, we interpret subsection (A) to mean that a determination that a parent physically abandoned a child may also support a finding that the parent is not willing to provide care for that child. Indeed, we believe that in many cases the abandonment of a child demonstrates more clearly than testimony the parent's unwillingness to provide care. Thus, contrary to DHSS's argument and the suggestions of C.K. and O.R., parents cannot defeat a court's finding of abandonment simply by stating that they are willing to care for a child. Rather, a court, just as it does under the first prong of the abandonment test, must look to objective conduct in determining whether a parent is willing to provide care. This same approach applies as well to relatives who assert a willingness to provide care.[6]

DHSS also argues that a failure to rule that abandonment provides an independent basis for CINA jurisdiction is contrary to evidence of the legislature's intent in drafting subsection (A). Under our "sliding scale" approach to statutory interpretation,

(The latter section was recently amended so as to delete subsections (C) and (D). Ch. 59, § 43, SLA 1996.) That section provided:

> (2) "runaway minor" means a person under 18 years of age who
> ....
> (C) has no parent, guardian, custodian, or relative able or willing to provide care; *or*
> (D) has been physically abandoned by
> (i) both parents;
> (ii) the surviving parent; or
> (iii) one parent if the other parent's rights and responsibilities have been terminated ... or voluntarily relinquished.

Ch. 144, § 4, SLA 1988 (emphasis added). Thus, the legislature, by using "or" instead of "including" to join the abandonment provision with the "willing to provide care" clause clearly indicated in this section that abandonment was an independent basis for determining a child to be a "runaway minor." That the legislature did not adopt similar language in drafting AS 47.10.010(a)(2)(A) suggests that it did not intend the abandonment provision in that subsection to be read independently.

6. As DHSS points out, we stated in *In re J.L.F.*, 828 P.2d 166, 170 n. 9 (Alaska 1992), *overruled in part by, In re S.A.*, 912 P.2d 1235 (Alaska 1996), that "abandonment is evidence that no relative is willing or able to provide care." We made this statement, however, in the context of cases in which a parent with custody of a child abandons the child by leaving it unattended or with a paid caregiver. In a case such as this, in which the parents never had custody of the child, abandonment provides little if any evidence that a relative is not willing to care for the child.

the plainer the language of the statute the more convincing the evidence of contrary legislative intent must be. *State v. Alex,* 646 P.2d 203, 208 n. 4 (Alaska 1982). As discussed above, the legislature's use of "including" to link the "care or willing to provide care" clause with the "physical abandonment" clause strongly indicates that it intended the latter to be subsidiary to the former. For us to interpret the subsection as DHSS suggests, the legislative history would have to show convincingly that the legislature intended the two clauses to be read independently. The legislative history relied on by DHSS—a memorandum from the attorney for the Children's Code Revision Task Force to Representative Terry Gardiner analyzing the bill revising AS 47.10.010—does not show such an intent. It merely states that the task force that drafted the current version of subsection (A) believed that the issue of abandonment should be addressed when the court establishes CINA jurisdiction rather than when it terminates parental rights. Nowhere does the memorandum indicate an intent one way or the other regarding the relationship of the abandonment provision with the rest of subsection (A). Therefore, we do not find it persuasive.

In light of this interpretation of subsection (A), we hold that the trial court properly found that C.K. and O.R., despite their statements to the contrary, are not willing to provide care for A.R. The same conduct that supports the court's finding of abandonment also provides sufficient evidence for the conclusion that their expressed willingness to care for her is not genuine.

This leaves the question, however, of whether the court adequately considered the possibility that A.R. has relatives willing to care for her. Testimony at the termination trial indicates that two of C.K.'s aunts, one in Texas, who has custody of two of C.K.'s older children, and one in California, expressed willingness to care for A.R. Although the record on this point is not clear, it appears that DHSS did little to determine whether A.R. might be placed with either of these relatives. DHSS never requested a "home study" to determine the appropriateness of placing A.R. with the aunt in Texas, relying instead on a social worker's informal statement that any request for such a placement "would be denied." DHSS did request a study regarding placement with the aunt in California. Due to some confusion in DHSS's request, however, the response from California was unclear. While the California agency initially denied the request, it seems that it did not realize that DHSS was looking for a permanent rather than a temporary placement. DHSS therefore renewed its request for a study, but at the time of trial it had not received a response.

We consider this record to be insufficient to support the superior court's finding that no relatives are willing to provide care for A.R. We therefore reverse the superior court's finding on this point and remand for additional findings as to whether C.K.'s aunts are willing to care for A.R. In making these findings, the court should not construe our opinion in *S.A.* to mandate a purely "subjective" approach to determining the willingness of these relatives to care for A.R. The court may properly determine whether these relatives are unavailable because of the restrictions of the Interstate Compact on the Placement of Children, AS 47.70.010, any other relevant provision of state or federal law, or some other reason making placement infeasible.

B. *Did the Superior Court Err in Finding that the Harmful Conduct of C.K. Was Likely to Continue if Their Parental Rights Were Not Terminated?* [7]

Before terminating the parental rights to a child adjudicated CINA under AS 47.10.010(a)(2), the court must find "by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights." AS 47.10.080(c)(3). C.K. argues that the superior court's conclusion that her "harmful conduct ... toward A.R. is likely to continue" is not supported by the record in this case.

7. O.R. does not challenge the superior court's conclusion that his harmful conduct toward A.R. is likely to continue.

In coming to its conclusion that C.K.'s conduct toward A.R. was likely to continue, the court focused on what it termed her "long-term polysubstance abuse problem." The court found it "particularly telling that [C.K.] was unable to control her [substance] abuse during 3 pregnancies despite knowing, after the first pregnancy, the harm that cocaine abuse causes to a baby." The court also noted C.K.'s failure to seek treatment prior to being jailed and reasoned that she would "likely ... continue to have drug problems since she has not been able to attain or maintain sobriety outside of the highly structured setting of a jail where there are fewer stresses and temptations." The superior court determined that C.K. "has a long way to go before she can put A.R. as a priority in her life since her recovery must be her first priority."

We conclude that the superior court's findings are supported by the record. The superior court reasonably looked primarily to C.K.'s actions while not incarcerated and gave less weight to her activities in jail. As discussed above, C.K. failed to maintain contact with A.R. or her other children or to find treatment for her substance abuse problems prior to incarceration. Therefore, we hold that the superior court's conclusion that C.K.'s harmful conduct toward A.R. is likely to continue after C.K.'s incarceration ends was not clearly erroneous.

C. *Did the Superior Court Err in Finding that Reasonable Efforts Had Been Made to Return A.R. to Her Home?*

Under CINA Rule 15(g), a court, prior to continuing an order removing a child from the child's home, must find by a preponderance of the evidence that "under the circumstances of the case, reasonable efforts were made to prevent or eliminate the need for removal of the child from the home and to make it possible for the child to return home." C.K. contends that the superior court finding with regard to this rule is not supported by the record.[8]

The superior court found that "[o]nce A.R. had been removed, [DHSS] made reasonable efforts to help the parents work toward reunification, by offering and urging visitation and substance abuse evaluation and treatment throughout the life of this case, without success." It also found that "[i]t was reasonable for the department [to] deal with [C.] K.'s continued substance abuse problem and the parents' lack of commitment to A.R. before any other services were provided." As discussed above, the record demonstrates that C.K. had many opportunities to visit A.R. and to address her substance abuse, but failed to take advantage of them. We agree with the superior court that without progress in these two areas any other efforts by DHSS toward reunification would have been futile.

IV. *CONCLUSION*

For the reasons above, we AFFIRM the superior court's findings that O.R. and C.K. physically abandoned A.R. under AS 47.10.010(a)(2)(A), that C.K.'s harmful conduct toward her is likely to continue, and that reasonable efforts were made to reunify A.R. with her parents. We REVERSE the court's finding that A.R. has no relative willing to provide care for her and REMAND for additional findings with regard to whether any of A.R.'s relatives are willing and available to care for her.

8. O.R. does not challenge the superior court's finding under CINA Rule 15(g) in this appeal.