946 P.2d 855 (1997)
R.J.M., Appellant,
v.
STATE of Alaska, Appellee.
P.M., Appellant,
v.
STATE of Alaska, Appellee.
J.M. and S.M., Appellant,
v.
STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.
Nos. S-7666, S-7675 and S-7676.
Supreme Court of Alaska.
September 19, 1997.
*857 John J. Connors and David G. Parry, Birch, Horton, Bittner & Cherot, Fairbanks, for Appellant R.J.M.
Bonnie J. Coghlan, Fairbanks, for Appellant P.M.
Michelle McComb, Law Offices of Robert S. Noreen, Fairbanks, for Appellants J.M. and S.M.
Nora King, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.
Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

OPINION
BRYNER, Justice.

I. Introduction

Former AS 47.10.010(a)(2)(F)  currently AS 47.10.010(a)(6)[1]  defines a child in need of aid (CINA) to include a child who has suffered "substantial physical abuse or neglect." In this appeal from a superior court order terminating parental rights, we consider whether "substantial physical abuse or neglect" includes emotional, mental, and social neglect.

II. Facts and Proceedings

A. Facts

R.J.M. and P.M. were married in 1973. In the course of their marriage, they had two children: a daughter, S.M., born in 1980, and a son, J.M., born in 1985. The family lived in Nenana.
P.M. was the primary caretaker of the children, but suffered from mental problems  paranoid and delusional thinking  that impeded her ability to provide them with proper care. P.M. kept the children out of school because she believed teachers were prying into the family's life and spreading rumors about her. Although P.M. purported to be home schooling the children, she in fact taught them little if anything.
R.J.M. did not object to P.M.'s treatment of the children or intervene in their behalf. An electronics technician at the Clear Air Force Base, he was "an absent parent" who "saw little of his children and provided little for them other than earning an income."
R.J.M. and P.M. separated in 1990 and entered into an acrimonious divorce action, which culminated in a three-day trial in March 1992. After the separation, P.M. reported that R.J.M. had sexually abused S.M.; as a result of the report, P.M. took custody of S.M. and J.M., and R.J.M.'s contacts with the children were restricted by court order to supervised visits.
On October 22, 1991, during one of the supervised visits, P.M. and R.J.M. became embroiled in an altercation in the children's presence. R.J.M. apparently provoked P.M. until she "totally lost control." P.M. attacked R.J.M. physically, threatened him with a knife, and threw a fork at him; the fork missed R.J.M. but struck J.M.P.M. proceeded to scream obscenities at R.J.M. and the children, ordering S.M. to get out, and telling her to "take a rope and hang yourself in your bedroom."
As a result of this incident, the Division of Family and Youth Services (DFYS) took emergency custody of the children and, two days later, petitioned for temporary CINA custody. The CINA petition described the October 22 altercation and alleged the need to protect J.M. and S.M. from imminent harm arising out of P.M.'s "long and significant history of mental instability," and R.J.M.'s alleged sexual abuse.
Superior Court Judge Mary E. Greene found probable cause to believe that S.M. and J.M. were CINA, and granted temporary *858 custody to the State through December 27, 1991. Some time before then, however, DFYS decided to relinquish custody of the children to R.J.M. P.M.'s accusation of sexual abuse against R.J.M. remained unsubstantiated, and neither child had reported sexual abuse by anyone. "[S]ince [P.M.] was still exhibiting bizarre behaviors which greatly restricted her ability to care for the children, they were returned to the custody of [R.J.M.]."
P.M.'s and R.J.M.'s divorce case was tried before Judge Greene in March 1992; their divorce became final on April 29, 1992. In resolving the issue of custody during the divorce trial, Judge Greene found that P.M. and R.J.M., together, "created an extremely dysfunctional homelife for the children." Nevertheless, the judge also found that the children were generally "happy, healthy, and apparently well-adjusted." Rejecting as "totally unfounded" P.M.'s claims that R.J.M. had sexually abused the children, the judge awarded legal and physical custody to R.J.M., noting that "[P.M.'s] mental problems make it impossible for her to provide good care for the children in meeting all of their needs."
Judge Greene granted P.M. visitation rights, but required that her visits be supervised by a neutral third party "until such time as [P.M.] obtains treatment which will allow her to control her behavior." Judge Greene also ordered "a program of regular counseling" for R.J.M., S.M., and J.M.
S.M. and J.M. remained in R.J.M.'s care from December 1991 until July 1993. During this time, R.J.M. continued to be "an absent parent," hiring a series of nannies to care for the children. On July 14, 1993, the third of these nannies, Nyakerario Omete Brown, who had become romantically involved with R.J.M., reported that she suspected R.J.M. of sexually abusing S.M. Upon receiving Brown's report of sexual abuse, DFYS took emergency custody of the children. The Alaska State Troopers interviewed S.M. the next day (an interview that Judge Greene would later find "seriously flawed"), and S.M. confirmed Brown's report, telling the troopers "that her father had been sexually abusing her over a period of time."
Based on the report of S.M.'s sexual abuse, DFYS filed a CINA petition for temporary custody on July 17, 1993. In August, the initial petition was replaced by a petition reiterating the sexual abuse allegations, noting that S.M. "refuse[d] to return to her father's care," and asserting that S.M.'s abuse in turn "created an unhealthy emotional climate for [J.M.]." The petition went on to state that P.M. was unable to care for the children due to her mental instability. Accordingly, the petition asserted that "[n]either parent is now able to provide for the emotional, mental and social needs of either child."
A month after the children were taken into emergency custody, DFYS psychologist Marti Cranor performed psychological evaluations on them. Cranor reported that J.M. was "undersocialized" and that S.M. had poor socialization skills. Cranor found J.M. to be "an emotionally disturbed boy who struggles with significant feelings of anxiety and depression. He is an unhappy boy whose needs for dependency and protection are not being met." Cranor felt that J.M.'s depression might turn to attempts at suicide. Cranor found S.M. to be "a highly anxious, insecure, and depressed young lady who feels inadequate and inferior"; Cranor also noted that S.M. was "overly concerned with sexual matters," was "at risk for promiscuous behavior," and had "strong needs for support, structure, nurturance, and dependency which are not currently being met."
S.M. and J.M. were initially placed in a foster home in Nenana; at the end of October, DFYS moved them to a foster home in Fairbanks in order to facilitate visitation with P.M. (who lived there) and to give them easier access to counseling.
On October 25, 1993, R.J.M. stipulated, without admitting to any criminal act, that S.M. and J.M. were CINA and that their best interests would be served by committing them to State custody for a period not to exceed two years. As part of the stipulation, R.J.M. agreed to participate in a sexual offender evaluation, and DFYS agreed not to make the results of the evaluation available for criminal prosecution.
*859 The superior court accepted R.J.M.'s stipulation. After a hearing concerning P.M.'s situation, Judge Greene noted that P.M. had failed to follow through on the treatment recommendations made in the divorce action; the judge found P.M. incapable of caring for her children due to her mental problems and concluded that she would remain incapable "until she learns controls on her behavior and develops an understanding of how her behavior impacts the children." The court thus left the children in foster placement.
Beginning in December 1993, S.M. and J.M. were taken out of foster care to spend a five-week visit with P.M. By the end of the visit, J.M. was anxious to go back to Nenana, but S.M. adamantly opposed leaving P.M. DFYS remained convinced, however, that P.M.'s mental problems prevented her from being a viable long-term custodian. The children's therapist recommended that they be given a permanent placement, preferably in Nenana.
Meanwhile, S.M. had recanted her statement to the Alaska State Troopers concerning R.J.M.'s acts of sexual abuse; R.J.M. had been seen by a specialist in the assessment of sexual offenders, who had concluded that R.J.M. did not fit the profile of a pedophile. Having no access to the troopers' criminal investigation files and having never been given the details of Nyakerario Omete Brown's initial report of sexual abuse, DFYS found itself unable to confirm that R.J.M. had sexually abused S.M. Under these circumstances, in mid-January 1994, DFYS reluctantly decided to return the children to R.J.M.
On the day set for return of custody, however, R.J.M., accompanied by Nyakerario Omete Brown, appeared at the DFYS office and notified the children's case worker that "it would not be in the children's best interest to return home that day to him." R.J.M. gave no further explanation. At a follow-up meeting the next week, however, R.J.M. said he would be willing to take the children back at some unspecified future time; he explained that Brown would no longer be living at his house, so he needed to make alternative child-care arrangements.
DFYS took R.J.M.'s behavior as a sign that his children "weren't as important as what was going on in his personal life." At a deposition of Nyakerario Omete Brown conducted in February 1994, DFYS heard for the first time the specifics of Brown's sexual abuse allegations. Furthermore, S.M. seemed "extremely upset" at the prospect of being returned to her father.[2] Accordingly, DFYS reconsidered its options and decided against returning custody to R.J.M.
After again placing the children in foster homes, DFYS decided upon a permanent guardianship arrangement as "the most appropriate goal for the children." S.M. eventually found placement with a family in Seward; J.M.'s Fairbanks foster family volunteered to become his permanent guardians. On December 30, 1994, the court adopted a DFYS case plan recommending permanent guardianships. The following month, DFYS petitioned for appointment of guardians; trial was set for May 1995.
R.J.M. and P.M. actively resisted the State's proposed guardianship arrangements. So actively, in fact, that both sets of prospective guardians felt threatened by R.J.M.'s and P.M.'s actions and began to fear that their efforts to prevent the guardianships might persist and escalate.[3] Both prospective guardian families became reluctant to proceed with the guardianships under these circumstances.
DFYS decided against searching for new guardians: but for the coercive atmosphere created by R.J.M. and P.M., the current *860 placements seemed to be working out well for both children; moreover, altering custody to new guardian candidates might prove futile, since they, too, might be readily threatened and intimidated.
Given R.J.M.'s and P.M.'s history of disruptive parental conduct and the "prospect ... of ongoing embattlement," DFYS concluded that the proposed guardianships were no longer a viable option and that termination of parental rights offered the only realistic chance of preserving the children's current placements. On May 11, 1995, the agency petitioned to terminate R.J.M.'s and P.M.'s parental rights; several days later, the agency moved to dismiss the previously filed guardianship action.[4]

B. Proceedings

After dismissing the guardianship case, the superior court scheduled the parental termination action for trial. The termination trial began on December 26, 1995, and, with periodic interruptions, lasted until March 7, 1996.
Following trial, Judge Greene thoroughly evaluated the evidence and made extensive findings concerning the evidence she had heard over the course of the lengthy and hotly disputed proceedings. The core of the judge's findings related to the issue of emotional neglect.
In relevant part, Judge Greene found that, although there was no evidence that S.M. and J.M. had been physically abused or physically neglected by R.J.M. and P.M., there was clear and convincing evidence that both children had "suffered substantial emotional neglect as a result of conditions created by both Mr. and Mrs. [M.]" Judge Greene likewise found that R.J.M. and P.M. were "unable to provide for the emotional, mental, and social needs of [S.M.] and [J.M.]." These findings led Judge Greene to conclude that S.M. and J.M. were children in need of aid under AS 47.10.010(a)(2)(F).
After determining that DFYS had "made reasonable efforts to eliminate the need for removal of the children from the parental home," Judge Greene went on to find clear and convincing evidence that S.M. and J.M. would likely continue to suffer substantial emotional neglect if they remained in the custody of their parents.
These findings vested the court with authority to terminate R.J.M.'s and P.M.'s parental rights as to both children. However, upon considering the best interests of each child, Judge Greene decided that in light of S.M.'s advanced age and her established bonds with both parents, termination of her parental ties to R.J.M. and P.M. would not serve her best interests. Accordingly, Judge Greene ordered R.J.M.'s and P.M.'s parental rights terminated only as to J.M. While declining to terminate R.J.M.'s and P.M.'s parental ties to S.M., the judge ordered S.M. to continue in State CINA custody for a period not to exceed two years.

III. Discussion

The M.s appeal on multiple grounds; their primary challenge, however, is to the propriety of the order terminating parental rights as to J.M.[5] We address this issue first.

A. Propriety of J.M.'s termination

1. Standard of review and statutory framework

In reviewing the trial court's factual findings on the issue of termination, we apply the *861 "clearly erroneous" standard. In re S.A., 912 P.2d 1235, 1237 (Alaska 1996).[6] However, in determining whether the trial court's findings comport with the requirements of the CINA statutes and rules, we deal with questions of law, and so apply the de novo standard of review. See R.R. v. State, 919 P.2d 754, 755 n. 1 (Alaska 1996); Langdon v. Champion, 745 P.2d 1371, 1372 n. 2 (Alaska 1987). We bear in mind at all times that terminating parental rights is "a drastic measure." In re J.L.F. & K.W.F., 828 P.2d 166, 170 (Alaska 1992).
The statutory framework governing the termination of parental rights is well established. Under AS 47.10.080(c)(3), termination is authorized
upon a showing ... by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a) as a result of parental conduct and upon a showing ... by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights[.]
See also CINA Rule 15(c).
This statute requires the court to determine, initially, whether there is clear and convincing evidence warranting a CINA adjudication under AS 47.10.010(a)(2). Nada A. v. State, 660 P.2d 436, 439-40 (Alaska 1983). Then, still guided by the clear and convincing evidence standard, the court undertakes an additional two-step inquiry, asking, first, whether the child is a child in need of aid "as a result of parental conduct" and, second, whether that conduct "is likely to continue to exist." Id. at 440 (quoting AS 47.10.080(c)(3)); A.M. v. State, 891 P.2d 815, 819 (Alaska 1995), overruled in part by In re S.A., 912 P.2d at 1241. In addition, in any case involving removal of a child from home, the court must find that "reasonable efforts were made to prevent or eliminate the need for removal of the child from the home and to make it possible for the child to return to the home." CINA Rule 15(g). Last, as with any other dispositional order entered under AS 47.10.080(c), the court must consider whether the disposition of terminating parental rights is in the best interests of the child. AS 47.10.082(1); Nada A., 660 P.2d at 439-40.
Subsections (A) through (F) of AS 47.10.010(a)(2) define the various substantive grounds for a CINA adjudication.[7] Here, as a predicate for placing S.M. in State custody *862 and terminating R.J.M.'s and P.M.'s parental rights as to J.M., the trial court found clear and convincing evidence of CINA status under subsection (F) of AS 47.10.010(a)(2); this provision allows the trial court to make a CINA finding when a child has "suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian."

2. Trial court's finding of CINA jurisdiction under subsection (F)

While finding no evidence that S.M. or J.M. had been physically abused or physically neglected by their parents, the trial court interpreted subsection (F)'s central statutory phrase "substantial physical abuse or neglect" to include substantial emotional neglect. Specifically, the court read the word "physical" as modifying the word "abuse" but not the word "neglect"; in contrast, the court read "substantial" as modifying both "abuse" and "neglect." The court thus construed subsection (F)
to include substantial neglect of the children's needs. Those needs include emotional, social, psychological needs, and therefore, [(F)] includes substantial emotional neglect.
Applying this interpretation to the evidence presented at trial, the court found by clear and convincing evidence that both J.M. and S.M. had suffered "substantial emotional neglect as a result of conditions created by both [R.J.M. and P.M.]." The court found both children CINA as to both parents on this ground.

3. Propriety of including emotional neglect under subsection (F)

The M.s argue that the trial court misread subsection (F); they insist that the subsection reaches only physical harm: that, properly construed, the statutory phrase "substantial physical abuse or neglect" must mean "substantial physical abuse" or "substantial physical neglect." For a number of reasons, we agree.

a. Analysis of subsection (F)'s phrasing

As a matter of syntax alone, the trial court's interpretation of subsection (F) seems strained. The key statutory phrase is "substantial physical abuse or neglect." A colorable argument might be made from this phrasing that "substantial" and "physical" both modify "abuse" but that neither modifies "neglect." The phrasing provides no basis, however, for splitting the modifiers  that is, for applying "substantial" to both "abuse" and "neglect," while applying "physical" only to "abuse."

b. Analysis of common meanings of "abuse" and "neglect"

Nor do the common definitions of "abuse" and "neglect" suggest a basis for concluding that "physical" was meant to apply to one word but not the other. As commonly defined, "abuse" means "wrong, bad, or excessive use[;] ... mistreatment; injury," while "neglect" means "lack of sufficient or proper care; negligence; disregard."[8] These definitions make clear that "abuse" and "neglect" are corollary terms. Both imply the potential for infliction of harm; the former word generally denotes potentially harmful action, while the latter generally denotes potentially harmful inaction.[9]
*863 Hence, "abuse" and "neglect" differ not in the quality or quantity of inflicted harm but rather in the manner in which that harm is brought about: whether the harm results from active or passive conduct. The potential harm encompassed by each word is identical; if the harm results from improper action, we label the action abuse; if the same harm results from improper inaction  a failure to act by one who has a duty to do so  we label the inaction neglect.
Often, of course, there is no clear line of demarcation between abuse and neglect. Since these corollary terms do not differ in the types of harm they cover but rather describe the manner in which an injury is brought about, their area of overlap is broad. Any injury may result from multiple causes. Depending on the perspective of the viewer, a given injury may be seen as resulting from abuse, neglect, or both; attaching one label or the other is frequently an arbitrary process.[10]

c. Analysis of subsection (F) in light of CINA statute's intent

That abuse and neglect are little more than two sides of the same coin is critical for purposes of interpreting subsection (F)'s key phrase, "substantial physical abuse and neglect." We must interpret the CINA statute "in accordance with its plain intent." In re S.A., 912 P.2d 1235, 1241 (Alaska 1996). The plain intent of AS 47.10.010(a)(2) is to protect children in need of aid from harm. Given that abuse and neglect are labels for active or passive causes of the very same harm, and given further that these labels are often interchangeable, it seems virtually inconceivable that a legislature intent on protecting children from harm should enact sharp and seemingly haphazard distinctions between harm resulting from parental abuse, on the one hand, and like harm resulting from parental neglect, on the other.
Because "abuse" and "neglect" are commonly viewed as integral parts of a single concept of harm, joining these words together  as in the phrase "abuse or neglect"  is commonplace in ordinary usage. For example, Chapter 10 of Title 47 repeatedly refers to "child abuse or neglect." See AS 47.10.310(c)(4)(A); AS 47.10.340(2); AS 47.10.394(b)(1); and AS 47.10.396(2). It cannot plausibly be suggested that the legislature intended "child abuse or neglect" to include either "child abuse" or "neglect" of children and adults; rather, the legislature obviously meant "child" to modify both "abuse" and "neglect." A similar intent seems apparent when "physical," rather than "child," is used to form "physical abuse or neglect." It is interesting to note that the closely analogous phrase "physical injury or neglect" is used by AS 47.17.010 (setting out the purpose of Alaska's Child Protection Act) in a sentence whose structure unmistakably indicates that "physical" applies to both "injury" and "neglect": "In order to protect children whose health and well-being may be adversely affected through the infliction, by other than accidental means, of harm through physical injury or neglect, mental injury, sexual abuse, sexual exploitation, or maltreatment...." Had the legislature meant to apply the modifier "physical" only to "injury," the correct phrasing would have been: "physical injury, neglect, mental injury, [etc.]."
It would make no sense to preclude the State from intervening on behalf of a child whose self esteem is hurt by the tirades of an infuriated parent  active conduct amounting to emotional abuse  while inviting intervention on behalf of a child identically hurt by the inattentiveness of an "emotionally distant" parent  passive conduct amounting to emotional neglect. The senselessness of this result leaves no reason to think that the legislature meant "substantial physical abuse *864 and neglect" to cover only one narrow form of abuse, physical abuse, but virtually any form of neglect, be it physical, mental, emotional, or social.[11]

d. Contextual analysis of subsection (F)

A contextual reading of subsection (F) supports the interpretation suggested by its plain meaning and apparent intent. Subsection (F) is one of six subsections defining CINA status, subsections (A) through (F). Two of the six  subsections (A) and (B)  directly address nonphysical harms. Subsection (A) defines CINA status to include any child "having no parent ... willing to provide care[.]" For purposes of this subsection, "care" is sweepingly defined to include "the physical, emotional, mental, and social needs of the child[.]" AS 47.10.990(1). Subsection (B) likewise encompasses nonphysical harms, defining CINA status to include any child in need of aid as a result of a parent's knowing failure to provide "medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward others[.]"
Viewed in context with its five companion subsections, then, subsection (F) seems to be aimed at a distinct and relatively narrow problem: physical harms resulting from abuse or neglect. This is certainly the way we understood the provision when we said recently in In re S.A., 912 P.2d at 1241, that "[s]ubsection (F) concerns `substantial physical ... neglect.'" (Ellipsis in original.) Furthermore, this straightforward contextual reading of subsection (F) is compatible with S.A.'s "analysis of the structure and purposes of the entirety of AS 47.10.010(a)(2)." Id. at 1240-41.
In S.A., the State argued for an interpretation of subsection (A) that would have allowed a CINA adjudication to be based on a general finding of inability, rather than unwillingness, to provide care. Id. at 1239-40. Our analysis of the CINA statute's structure as a whole led us to reject the State's proposed interpretation. Id. We described the six subsections of AS 47.10.010(a)(2) as consisting of one provision generally covering situations in which care is altogether lacking and five narrower provisions covering particular kinds of improper care:
[S]ubsection (A) is designed to deal with situations where the parent abandons the child, the child runs away, or the child refuses to accept the parent's care. The seriousness of these kinds of situations is congruent with the types of circumstances covered by subsections (B) through (F).
Unlike subsection (A), which focuses on a parent's willingness to care and does not explicitly give superior courts guidance in determining what constitutes inability to care, subsections (B) through (F) contain specific standards for adjudicating a child CINA and terminating parental rights based on a parent's or caregiver's inability to care. Under subsection (B), inability to provide needed medical treatment can support a CINA finding. Subsection (C) covers inability to care that causes, or creates an imminent and substantial risk of, substantial physical harm. Subsection (D) deals with sexual abuse or a danger of sexual abuse caused by a parent's inability to supervise a child or by other conditions created by the parent. Subsection (E) permits a CINA adjudication if a parent approves the commission of delinquent acts by the child. Subsection (F) concerns "substantial physical ... neglect."
Id. at 1241 (footnote omitted).
In rejecting the State's proposed interpretation of subsection (A), we reasoned that this interpretation "would permit CINA adjudications [under subsection (A)] based on parenting deficiencies much less severe than those covered under [subsections] (B)-(F)." Id. at 1240. We explained:
[T]he State's reading of subsection (A) would give the State the power to assume custody over children for much less serious *865 types of parental misconduct and harm to children. The State would define ability to care as the ability to provide for the physical, emotional, mental, and social needs of a child.... This interpretation would permit the State to assume custody over any child who had needs the child's parents could not meet. Applied to the facts of this case, the State's interpretation would justify terminating N.A.'s parental rights on the grounds that S.A. and D.A. would not "meet their potential" with N.A. because she would not be able to satisfy their needs for "structure and consistency."
Id. at 1241 (citations omitted).
We also reasoned that broadening subsection (A) in the manner proposed by the State
would make ... subsections (B) through (F) superfluous. A superior court would not have to determine whether the requirements in subsections (B) through (F) were met if the court could easily declare a child CINA upon a general finding of inability to care under subsection (A).
Id. (footnote omitted).
In the present case, were we to accept the interpretation of subsection (F) adopted by the court below and advocated by the State on appeal, we would effectively do with that subsection what we specifically declined to do with subsection (A) in S.A.: we would convert subsection (F) from a provision stating a "clear, specific standard[,]" id. at 1240, and describing a "serious form[] of parental misconduct," id., into a general provision that would enable the State "to assume custody over any child who had needs the child's parents could not meet." Id. at 1241. So construed, subsection (F) would allow parental rights to be terminated "on the grounds that [children] would not `meet their potential' with [their parents]." Id. The interpretation would also render subsections (A) through (E) superfluous by ensuring that "the court could easily declare a child CINA upon a general finding of" substantial emotional neglect. Id. This is precisely the kind of overarching interpretation we have already refused to attach to subsection (A).

e. State's definition-based argument

Although the State argues vigorously that subsection (F) should be read to cover any kind of neglect, so long as it is "substantial," its argument is unpersuasive. The State points first to AS 47.17.290, which defines "neglect," as "the failure by a person responsible for the child's welfare to provide necessary food, care, clothing, shelter, or medical attention for a child." AS 47.17.290(10) (emphasis added). Focusing on the word "care" in this definition, the State points next to AS 47.10.990(1), which defines care to mean "to provide for the physical, emotional, mental, and social needs of the child[.]" This definition leads the State to conclude that "neglect," as used in subsection (F), cannot be restricted to physical neglect, but must also include emotional, mental, and social neglect.
There are two flaws in the State's logic. First, the State relies on definitions of "neglect" and "care" that do not apply to subsection (F). The definition of "neglect" set out in AS 47.17.290(10) is expressly limited to statutory provisions contained in chapter 17, title 47. See AS 47.17.290. This definition of neglect is therefore inapplicable to any provision in chapter 10 of title 47, where the CINA statute is located. Similarly, the definition of "care" set out in AS 47.10.990(1) applies, in relevant part, only to subsection (A) of the CINA statute ("`care' ... under AS 47.10.010(a)(2)(A) ... means .. ."), and thus by its own terms has no application to subsection (F).
Second, even if these definitions applied to the word "neglect" as generally used in AS 47.10., their application in the specific context of subsection (F) would remain unresolved. Indeed, the State's argument essentially assumes away the major question of statutory construction presented in this case. The crucial issue here is not what "neglect" means standing alone; rather, it is whether the word's appearance in subsection (F)'s statutory phrase "substantial physical abuse and neglect" subjects it to the restrictive force of the modifier "physical." The State's definition-based argument provides no help in resolving this issue, for it simply presupposes that "neglect" stands alone, unmodified by *866 "physical."[12]
The dissent maintains that the legislature "must have thought that it was addressing the same sorts of harm in AS 47.10.010(a)(2)(F)" as it defined in AS 47.17.290. The dissent asks, "Why would the legislature require reports of harm under AS 47.17 for neglect resulting in mental injury unless it intended the same sorts of harm to trigger CINA jurisdiction?" This question is easily answered.
While the legislature undoubtedly intended chapter 17's reporting requirements to maximize the State's awareness of situations calling for CINA intervention, this hardly establishes that the legislature meant to require reports only when an observed harm was in itself so serious as to warrant formal CINA adjudication. To the contrary, it would seem logical that a legislature desiring to maximize information would require reporting of all circumstances in which a need for CINA intervention seemed reasonably possible. Mental and emotional harms can justify or contribute to CINA adjudication under AS 47.10.010(a)(2)(A) and (B) and are frequently indicative of other types of harm covered by other subsections of the CINA statute. Thus, the legislature had good reason to require emotional and mental harm to be reported, even if it wanted to exclude emotional neglect as a basis for CINA adjudication under subsection (F).
Moreover, the grounds for formal CINA adjudication are not coextensive with the threshold grounds for CINA intervention. Emergency CINA custody is allowed without court order under the circumstances set out in AS 47.10.142(a). These circumstances specifically include "neglect" in the broad sense defined in AS 47.17.290, but only when a minor is "grossly neglected" and it appears that immediate removal "is necessary to protect the minor's life or provide immediate necessary medical attention."
For present purposes, this provision has threefold significance: First, it plainly establishes another basis for Chapter 17's reporting requirement. Second, it clearly demonstrates that the legislature did not want emotional neglect to trigger even an emergency intervention in the absence of a strong, objectively verifiable physical need. And, third, it creates for temporary intervention a standard of "gross neglect" that seems difficult to reconcile with the dissent's proposed reading of AS 47.10.010(a)(2)(F), which would require only "substantial neglect" to justify permanent termination of parental rights.[13]

*867 f. Terminating parental rights as to J.M. based on emotional neglect unjustified

We agree with the dissent that the CINA statute is difficult to interpret and could benefit from a comprehensive and thoughtful revision. But under the current version of the statute, we find no justification for enlarging subsection (F) to include forms of neglect beyond substantial physical neglect. We conclude that a CINA finding under AS 47.10.010(a)(2)(F) is appropriate only upon proof of substantial physical abuse or substantial physical neglect.
In the present case, the trial court based its decision to terminate R.J.M.'s and P.M.'s parental rights as to J.M. on a finding of CINA status under subsection (F). In so doing, the court erroneously construed subsection (F) to extend to all forms of substantial neglect and specifically relied on emotional neglect to find the subsection applicable to J.M. Accordingly, the trial court's order terminating parental rights as to J.M. must be vacated.[14]

4. Subsection (A) as a potential alternative ground for CINA adjudication

a. Trial court's rejection of subsection (A)

It does not necessarily follow that termination under other subsections of the CINA statute would be inappropriate. As we have already mentioned above, two provisions other than subsection (F) address harms resulting from emotional, mental, and social abuse and neglect: subsections (A) and (B). Here, as originally conceived, the primary theory of the State's case was that J.M. and S.M. were CINA under subsection (A) because P.M. and R.J.M. were incapable of meeting the children's emotional, mental, and social needs. The State actively prosecuted its case under this theory until mid-trial, when this court's decision in S.A. was announced. S.A. held that willingness to provide care, rather than ability to provide care, is the proper measure of CINA status under subsection (A). In re S.A., 912 P.2d at 1241-42. Since both R.J.M. and P.M. had consistently expressed willingness to care for J.M. and S.M., the trial court concluded that S.A. barred CINA adjudication under subsection (A).
*868 Pressed by the sudden unavailability of subsection (A), the State resorted to subsection (F) as a fallback, arguing that "substantial physical abuse or neglect" meant either substantial physical abuse or substantial neglect of any kind. The trial court accepted the State's fallback position, noting with regret that it would have found CINA status under subsection (A) but for this court's just-announced decision in S.A.:
Based on all the evidence I conclude by clear and convincing evidence that Mr. and Mrs. [M.] are unable to provide for the emotional, mental, and social needs of [J.M.] and [S.M.]. The rule of law announced in S.A. [] says that the inability of the parents to provide care for the children is trumped by the parent's willingness to provide care. Mr. and Mrs. [M.] maintain their willingness, and since I am bound by S.A., I must conclude that the State has not met its burden under AS 47.10.010(a)(2)(A). I, however, urge the Supreme Court, should they review this case, to reconsider their interpretation of the statute.

b. Potential viability of subsection (A) CINA jurisdiction

The trial court's abandonment of subsection (A) may have been premature. The court and the parties alike appear to have assumed that R.J.M.'s and P.M.'s stated willingness to care for J.M. and S.M. automatically sufficed to preclude adjudication under subsection (A). Indeed, Judge Greene's findings reflect her belief that under subsection (A) the court was required to accept at face value R.J.M.'s and P.M.'s professions of willingness to provide needed care: "Mr. and Mrs. [M.] maintain their willingness, and since I am bound by S.A., I must conclude that the State has not met its burden under AS 47.10.010(a)(2)(A)."
Yet as we have more recently made clear, a parent's stated willingness is not dispositive of CINA status under subsection (A). In O.R. v. State, 932 P.2d 1303 (Alaska 1997), the State, arguing against a literal application of our decision in S.A., maintained that physical abandonment should provide an independent basis for CINA adjudication under subsection (A), regardless of the availability of a parent or relative who was willing to provide care. Id. at 1309. To hold otherwise, insisted the State, would "allow[] a parent to `defeat' a finding of physical abandonment `by mere words'"; any parent threatened with state action might, "on advice of counsel, make the minimal gesture of somehow communicating to the court, `I am willing to care for this child.'" Id. at 1310.
We rejected this argument in no uncertain terms, pointing out that actions often speak louder than words:
There is nothing in our opinion in S.A. that prohibits a court, when assessing the willingness of an individual to provide care for a child, from looking at actions or other objective criteria as well as "mere words."
Therefore, we interpret subsection (A) to mean that a determination that a parent physically abandoned a child may also support a finding that the parent is not willing to provide care for that child. Indeed, we believe that in many cases the abandonment of a child demonstrates more clearly than testimony the parent's unwillingness to provide care. Thus, ... parents cannot defeat a court's finding of abandonment simply by stating that they are willing to care for a child. Rather, a court ... must look to objective conduct in determining whether a parent is willing to provide care.
Id.
Here, despite R.J.M.'s and P.M.'s emphatic declarations of willingness to care for J.M. and S.M., the trial court found that both parents had consistently failed to provide for the emotional, mental, and social needs of their children. The court further found that, although the State had made diligent efforts over many years to provide appropriate treatment and training, neither R.J.M. nor P.M. had made any meaningful strides toward becoming an effective parent.[15] And in *869 accordance with AS 47.10.080(c)(3), the court found that R.J.M.'s and P.M.'s emotional, mental, and social neglect of their children was likely to continue.
The trial court based these findings on an extensive evidentiary record and articulated its decision in elaborate detail. Our review of the record convinces us that, despite R.J.M.'s and P.M.'s arguments to the contrary, these findings are amply supported by the record and are not clearly erroneous. Had the trial court additionally found that R.J.M. and P.M. are not willing to care for their children, the combined findings would have supported CINA adjudication under AS 47.10.010(a)(2)(A) and termination of parental rights under AS 47.10.080(c)(3).

c. Necessity of remand to reconsider subsection (A)

The only apparent basis for the trial court's refusal to find CINA status under subsection (A) was its conclusion that the court was bound to accept at face value R.J.M.'s and P.M.'s expressions of willingness to care for their children. Yet as pointed out in O.R., evidence of R.J.M.'s and P.M.'s continued neglect of their children and their entrenched resistance to all remedial efforts may in reality be more probative of their unwillingness to provide adequate care than of their inability to do so. See O.R., 932 P.2d at 1310. Willingness to provide care is a factual issue for the trial court. Here, we cannot say how the trial court would have resolved the issue had it "look[ed] to objective conduct in determining whether [R.J.M. and P.M. were] willing to provide care." Id. We thus conclude that a remand is necessary in J.M.'s case to allow the trial court to reconsider, in light of O.R., its finding on the issue of willingness to provide care.

B. Remaining issues

Given the need for a remand and the possibility of a renewed order of termination based on subsection (A), we think it necessary to address several procedural issues raised by R.J.M.

1. Recusal of Judge Greene

R.J.M. contends that Judge Greene erred in failing to recuse herself from trial. A short time before the originally scheduled September 1995 trial date, R.J.M. requested Judge Greene to recuse herself. He claimed that he had recently become aware of the judge's past service as a member of the Citizens' Advisory Committee to DFYS. He also complained of Judge Greene's exposure, in the context of the divorce proceeding, "to inflammatory and prejudicial testimony concerning [R.J.M.'s and P.M.'s] ... interaction with their two children." R.J.M. thus claimed that the judge may have prejudged his credibility. Judge Greene declined to recuse herself. R.J.M. renews his arguments on appeal.
Alaska Statute 22.20.020(a)(9) prohibits a judge from acting in a matter in which the judge "feels that, for any reason, a fair and impartial decision cannot be given." Judge Greene resigned as a member of the DFYS advisory committee upon appointment to the bench in 1985. The committee dealt primarily with issues of juvenile delinquency, not CINA issues. In denying R.J.M.'s recusal motion, the judge noted that "there is nothing about my participation in that committee at least 10 years ago which is a basis for recusal."
In addressing R.J.M.'s claim of exposure to prejudicial information in the divorce proceedings, Judge Greene noted that, in the past, R.J.M. had "consistently taken [the position] that the two cases [the divorce and CINA proceedings] should be heard by the same judge and, in fact, consolidated." Noting that R.J.M. had "no concern about the court's participation in both cases when he was granted custody of his children in the divorce," and that "[h]is concern only arises now when the court has issued rulings not in his favor," Judge Greene ruled that R.J.M.'s recent concern was "not well-founded."
This court will not overturn a trial judge's recusal decision "unless it is plain that a fair-minded *870 person could not rationally come to that conclusion on the basis of the known facts." Amidon v. State, 604 P.2d 575, 577 (Alaska 1979). Applying this standard to the present circumstances, we conclude that Judge Greene was justified in denying R.J.M.'s recusal motion. Cf. Perotti v. State, 806 P.2d 325, 327-28 (Alaska App. 1991).

2. Psychological interview of S.M.

R.J.M. next contends that the trial court erred in refusing to allow a psychological interview of S.M. by R.J.M.'s therapist, Dr. Jane Krauss. R.J.M. requested the examination to shed light on S.M.'s condition at the time of trial and to assist Dr. Krauss in treating R.J.M. On appeal, R.J.M. argues that denial of his request for a psychological interview prejudiced his reunification efforts and deprived the trial court of substantial evidence bearing on S.M.'s status.
In denying R.J.M.'s request, the trial court stated, in relevant part:
The court does not find an adequate showing of need. The minor has been quizzed on the allegations of sexual assault by many people. Dr. Krauss can talk [with] them [without] putting S.M. through another interview. It is not Doctor Krauss'[s] role to determine what [S.M.] wants to do.
The court also noted that Dr. Krauss "clearly takes an advocacy stand for her patient [R.J.M.]." Given these findings, which are supported by the record, we conclude that the trial court did not abuse its discretion in denying R.J.M.'s request.
Alternatively, we find that any error in denying the request was inconsequential. We see no merit to R.J.M.'s claim that denial of an interview with S.M. interfered with his treatment efforts, in turn prejudicing his reunification efforts. The trial court expressly found that R.J.M. had made only superficial attempts at treatment. This finding is not clearly erroneous. R.J.M.'s failure to make any genuine effort at treatment precludes a finding of any significant impairment resulting from Dr. Krauss's inability to interview S.M. Beyond this, issues concerning S.M.'s pretrial psychological status are now moot, since the trial court did not terminate R.J.M.'s parental rights as to S.M. and since neither S.M. nor R.J.M. has specifically challenged the trial court's determination that S.M. is CINA under AS 47.10.010(a)(2)(D).

3. Extension of pretrial CINA custody

R.J.M. further asserts that the trial court erred in extending the State's pretrial CINA custody of the children beyond the initial two-year period allowed under AS 47.10.080(c).[16] R.J.M. initially consented to a two-year CINA commitment. The two-year period was to expire on October 27, 1995; trial was initially set for September 14, 1995. At a pretrial conference in early September, P.M.'s counsel successfully moved for a continuance until December. R.J.M.'s attorney, however, expressed uncertainty as to whether R.J.M. (who was not then present) would agree to extend State custody beyond the originally agreed upon two-year period. Judge Greene determined that she would extend custody and that, if R.J.M. was unwilling to agree, counsel could "bring it up later."
R.J.M. waited more than a month to lodge his objection: on October 16, less than two weeks before the original two-year period of custody would have expired, R.J.M. moved to release his children back to his care and custody. The court denied his motion. Given R.J.M.'s delay in objecting to continuation of custody, the nearness of the trial date at that time, and R.J.M.'s failure to make any convincing showing of potential prejudice arising from continued State custody, the trial court's order did not constitute an abuse of discretion. See CINA Rule 19(e)(4).[17]

*871 4. Deprivation of J.M.'s and S.M.'s right to testify

R.J.M. lastly claims that the trial court deprived J.M. and S.M. of their constitutional right to due process by refusing to allow them to testify under oath about their placement preferences. Although R.J.M. couches his argument exclusively in terms of J.M.'s and S.M.'s rights to due process, he cites no authority establishing his standing to assert violations of the children's constitutional rights.
Both children have participated in this appeal, yet neither personally raises these constitutional claims. Moreover, both children were interviewed by the court in chambers during the trial, and the court was well aware of their placement preferences. R.J.M. apparently did not then object to the in-chambers interview format. On appeal he makes no persuasive showing of potential prejudice to himself, and the record reveals none.
Under these circumstances, we hold that R.J.M. has failed to establish standing to assert the alleged violations of his children's constitutional rights.

IV. Conclusion

The superior court's order continuing State CINA custody over S.M. is AFFIRMED. The superior court's order terminating R.J.M.'s and P.M.'s parental rights as to J.M. is VACATED. This case is REMANDED for further proceedings as to J.M. not inconsistent herewith.
EASTAUGH, J., with whom COMPTON, C.J., joins, dissenting.
EASTAUGH, Justice, with whom COMPTON, Chief Justice, joins, dissenting.
In my view, the superior court did not err in finding J.M. a CINA under AS 47.10.010(a)(2)(F) (now AS 47.10.010(a)(6)).[1] I therefore dissent from the court's discussion of that subsection and would affirm the judgment below. Although the result the court reaches is preferable to outright reversal in favor of R.J.M., it is much less desirable than outright affirmance, the result I would reach.

C. AS 47.10.010(a)(2)(F)

The court reasons that the phrase "substantial physical abuse or neglect" in AS 47.10.010(a)(2)(F) cannot be read as the superior court read it, i.e., as though "substantial" modifies both "physical abuse" and "neglect." The court explains its reasons well, but I cannot agree with its conclusion. I read subsection (a)(2)(F) to encompass "substantial ... neglect," including emotional neglect. To read it otherwise leaves a dangerous gap in the protection I think the statute was intended to provide.
Alaska Statute 47.10.010(a)(2) appears to me to be intended to provide comprehensive protection for children in jeopardy. In In re S.A., 912 P.2d 1235, 1240 (Alaska 1996), the court noted that subsection (A) addressed situations in which the parent abandons the child, the child runs away, or the child refuses to accept the parents' care. Id. at 1241. This court summarized subsections (B) through (F) as follows: "Under subsections (B) through (F), only serious forms of parental misconduct can support a CINA adjudication. Subsection (B) deals with failure to provide needed medical treatment. Subsection (C) concerns `substantial physical harm' caused by parental conduct. Subsection (D) addresses sexual abuse. Subsection (E) is about parental encouragement of criminal conduct. And subsection (F) speaks of `substantial physical abuse or neglect.'" Id. at 1240. Although I dissented from the court's interpretation of subsection (A), id. at 1242, the court's summary of the statute's subsections provides a useful overview of the scope of AS 47.10.010(a)(2).[2]
*872 The statutory list of hazards that justify CINA jurisdiction seems thorough and complete. The list appears to embrace all types of hazards posed to children at risk; likewise, it appears to address all sources of substantial harm, posed either directly by the parents or guardians, or by external forces not remedied by parents or guardians. There is no reason to think the legislature intended to catalogue possible hazards and sources of harm, but intentionally declined to reach the broad and well-recognized harm resulting from emotional neglect.[3]
There are several grammatically permissible ways to read the phrase "substantial physical abuse or neglect." One way is to read both adjectives, "substantial" and "physical," as modifying both nouns, "abuse" and "neglect." A second way is to read "substantial" as modifying both "physical abuse" and also "neglect." A third way is to read the phrase as though neither adjective modifies the noun "neglect." Thus, the phrase might alternatively be read as though it were written as follows: (1) "substantial physical abuse or substantial physical neglect"; (2) "substantial physical abuse or substantial neglect"; or (3) "neglect or substantial physical abuse."
The third reading leaves "neglect" unmodified and therefore unlimited. It seems unlikely the legislature intended nonsubstantial neglect to justify CINA jurisdiction. Context supports this conclusion, because "only serious forms of parental misconduct can support a CINA adjudication" under subsections (B) through (F). In re S.A., 912 P.2d at 1240.
As for the second reading, there is no grammatical reason why the adjective "substantial" cannot modify both "physical abuse" and "neglect." Syntax does not preclude this reading, although the court holds to the contrary. This second reading is also valid contextually because the requirement of "substantial" neglect prevents CINA jurisdiction from being lightly invoked for trivial harms, and the quality of harm is comparable to that required under other passages in subsection (a)(2).
My reading is in part propelled by my view that the statute was intended to provide comprehensive protection, and that subsection (a)(2)(F) is the most fitting source of jurisdiction when a child suffers emotional neglect. That harm is not directly treated by subsection (a)(2)(B), which instead deals with the parents' failure to obtain professional assistance needed to treat a child's emotional problems. The failure to provide treatment under that subsection requires proof of elements not required by subsection (a)(2)(F).
The first reading is also grammatically permissible. It is the reading the court prefers. It is not the reading I think the legislature intended, however, because it offers substantially less protection than the grammatically and contextually valid reading I propose. The purpose of AS 47.10.010, after all, is to confer jurisdiction to protect children. Given two grammatically correct ways of reading a remedial, protective statute, we should not adopt a reading that is substantially less protective.
The court declines for a number of reasons to read subsection (a)(2)(F) as I would.
It first relies on syntax to reason that there is no basis for splitting the modifiers in the phrase "substantial physical abuse or neglect" and to read "substantial," but not "physical," as modifying "neglect." Maj. op. at 862. My disagreement with that reason is explained above.
The court next reasons that common definitions of "abuse" and "neglect" do not suggest that "physical" was intended to modify one word but not the other. Maj. op. at 862-863. These common definitions do not aid the court's analysis, although to the extent they imply an active/passive dichotomy, they are consistent with restricting "physical" to "abuse." Moreover, for reasons discussed infra, I believe these common definitions should also be read in light of the specialized definitions the legislature adopted in similar contexts.
Next, reasoning that "abuse" and "neglect" are overlapping corollary terms for causes of *873 "the very same harm," the court concludes that it would make no sense to limit the subsection's coverage to abuse that is physical, while extending it to cover neglect that is physical, mental, emotional, or social. Maj. op. at 863-864. This reason provides the strongest support for the reading the court proposes.
The trouble with this reason is that it assumes the legislature intended to reach the "very same harm" for both abuse and neglect. Unfortunately, interpretation of AS 47.10.010(a)(2) has long been problematic, and we have often struggled to interpret its provisions consistently and rationally, with mixed results. I would be more willing to assume that the legislature intended to reach only one type of harm, physical and not emotional, in subsection (a)(2)(F) if the legislative history did not support a different conclusion. When the legislature amended subsection (a)(2) by adding subsection (F) for children who suffer "substantial physical abuse or neglect," the same bill also amended the AS 47.17.070(1) definition of "child abuse or neglect" to mean "the physical injury or neglect, sexual abuse, sexual exploitation, or maltreatment of a child...." Ch. 104, § 8, SLA 1982 (emphasis on language added by amendment). When the legislature amended this definition, "neglect" was defined to mean "the failure by a person responsible for the child's welfare to provide necessary food, care, clothing, shelter, or medical attention for the child...." AS 47.17.290(10) (formerly AS 47.17.070(5)). The legislature again amended the definition of "child abuse or neglect" in 1990, by adding the words "mental injury," so that the definition read as follows: "the physical injury or neglect, mental injury, sexual abuse, sexual exploitation, or maltreatment of a child." Ch. 29, § 5, SLA 1990. It also defined "mental injury" to mean injury "to the emotional well-being, or intellectual or psychological capacity of a child, as evidenced by an observable and substantial impairment in the child's ability to function...." Id.
The legislature, when it amended these chapter 17 definitions, must have thought that it was addressing the same sorts of harm in AS 47.10.010(a)(2)(F). Having required reports of harm for neglect resulting in mental injury, the legislature must have intended that the same sort of harm could trigger CINA jurisdiction. It required reporting in order to permit delivery of protective services to prevent further harm, to enhance the general well-being of children of Alaska, and to preserve family life whenever possible. AS 47.17.010; ch. 104, § 3, SLA 1982. There is no reason to think the legislature intended to reach emotional harm resulting from neglect in chapter 17, but also intended that neglect resulting in emotional harm could not be the basis for CINA jurisdiction in chapter 10.[4]
Thus, the obverse of the court's argument that CINA jurisdiction would be unduly enlarged if "physical" did not modify "neglect" is the argument that the court's reading would unduly limit the protection the statute provides. To read it as I propose at least covers emotional neglect, even if it does not cover emotional abuse. Because other provisions imply that the legislature intended to reach emotional neglect, I prefer to be guided by those than to rely on a narrow interpretation that deprives children of this protection.
The court next reasons that subsection (a)(2)(F) seems to be aimed at the problem of physical harms resulting from abuse or neglect. Maj. op. at 863-865. I disagree, because I do not read subsection (a)(2)(F) to be aimed only at physical harms, given other contemporaneous and subsequent amendments to AS 47.17.[5]
*874 The court also finds that accepting the superior court's interpretation of subsection (a)(2)(F) would convert it into a "general provision" that would enable the State to assume custody over any child who has needs the child's parents could not meet, and would render subsections (a)(2)(A) through (a)(2)(E) superfluous. Maj. op. at 865. I disagree. I do not read the six subsections of subsection (a)(2) to be so discrete. They naturally overlap with respect to both parental behaviors and the harms the children suffer. A given situation may well implicate two or more of these subsections. Moreover, there is no danger that subsection (a)(2)(F) will render other subsections superfluous. It certainly does not render subsection (a)(2)(B) superfluous, because even though that subsection specifically deals with mental harm, it does so only in context of a parent's knowing failure to provide professional treatment for that harm. The court may be concerned that the reading I would give the statute would permit DFYS to interfere inappropriately with child-parent relationships. Although that is a legitimate concern, reading "substantial" as modifying "neglect" adequately protects against undue DFYS interference. That is, after all, the limitation the legislature found adequate when it amended subsection (a)(2) to include "substantial physical abuse."[6]
The court also rejects the State's arguments that definitions of "neglect" in AS 47.17.290, and "care" in AS 47.10.990(1) apply, and concludes that, even if those definitions did apply, the "neglect" must be "physical," and not merely emotional. Maj. op. at 865-866.[7] As the court correctly notes, the legislature did not specify that those definitions control terms used in AS 47.10.010(a)(2)(F). On the other hand, the legislature did not see fit to define "neglect" differently in chapter 10. There is no reason to think it intended that the term should be applied and defined inconsistently in chapters 10 and 17. It is permissible to rely on statutory definitions provided in a closely related context. We should feel comfortable borrowing these definitions where there is no justification for applying some other, less common, definition. Moreover, the statutory definitions are consistent with the meanings of these words in everyday usage. See AS 01.10.040(a).
Finally, the court rigorously examines all references in chapter 10 to "neglect," Maj. *875 op. at 866 n. 13, to demonstrate that the legislature did not intend to import chapter 17's definition of "neglect" into chapter 10. This examination does not identify any other definitional source, and does not establish that the reading I propose was not intended by the legislature.
It is unfortunate that the imprecision found in AS 47.10.010(a)(2) has been the source of so much litigation. Issues of CINA jurisdiction and termination are difficult enough without an overlay of statutory imprecision. For example, after years of conflicting interpretations of AS 47.10.010(a)(2)(A),[8] the court attempted to resolve that conflict when it issued In re S.A., 912 P.2d 1235 (Alaska 1996). Even now issues relating to that subsection linger on. Nothing we said in S.A., for example, would have led the trial court in this case to anticipate O.R. v. State, 932 P.2d 1303 (Alaska 1997), or this court's discussion of subsection (a)(2)(A) in today's opinion. Interpretation of AS 47.10.010(a)(2) has presented the courts with difficult questions. Our answers to those questions may or may not have coincided with the original legislative intentions, and there is a certain degree of supposition when we adopt or propose a particular interpretation. One might expect or wish that the State, having received such mixed results in the past, would seek a comprehensive revision of the CINA and Child Protective Services statutes to enhance their consistency, and to make sure that CINA jurisdiction encompasses the harms the legislature wishes to address, and excludes those it does not. Statutes from all the states are conveniently collected in 3 Thomas A. Jacobs, Children and the Law: Rights and Obligations (1995) (Appendices). As it is now written and interpreted, Alaska's statue is potentially overinclusive or underinclusive, or both, depending on one's point of view. It would be better for the legislature to revisit the statute and, assuming it is not content with the interpretations adopted by this court in recent years, clarify it to reflect the legislature's actual intentions.

B. AS 47.10.010(a)(2)(A)

On a pragmatic level, and given the court's discussion of subsection (a)(2)(A) in In re S.A., I agree with the court's willingness to take into account a parent's record in caring for the child in considering whether the parent is "willing" to care for the child. I unsuccessfully proposed a more direct, and appropriate, way to interpret subsection (a)(2)(A) in In re S.A.
NOTES
[1] At the time of trial in this case, child in need of aid status was defined in subsections (a)(2)(A)-(F) of AS 47.10.010. Subsequently, the legislature repealed subsection (a)(1) of the statute; the provisions of subsections (a)(2)(A)-(F) were retained verbatim but were renumbered as AS 47.10.010(a)(1)-(6). AS 47.10.010(a)(6) is thus the current counterpart of former AS 47.10.010(a)(2)(F). For simplicity's sake, we will refer to the former statutory numbering, which governed here.
[2] At a staff meeting in April 1994, DFYS formed the consensus "that something of a sexual nature had happened" to S.M. by R.J.M. in R.J.M.'s home.
[3] S.M.'s prospective guardians testified that R.J.M. contacted them and told them "we were being wrong to do this, that we had no right to do this"; he later sent a note saying that if they continued to pursue a guardianship "we'll come after you one at a time and you'll be in court forever." J.M.'s prospective guardians testified that R.J.M. also harassed them, and repeatedly threatened them with continued litigation, leaving them convinced that if they pursued a guardianship they would "have him coming after us in court." Similarly, P.M. was frequently demanding, angry, and threatening toward both sets of prospective guardians.
[4] S.M. and J.M. remained in their foster placements after the termination action was filed and while the case was pending trial. In mid-trial, however, J.M.'s placement "blew up," and he was moved to another home. Based on discussions with J.M.'s foster parents and the best friend of the foster mother, J.M.'s DFYS caseworker concluded that the crisis had been precipitated by R.J.M.'s threats  that J.M.'s foster mother "didn't want the [M.s] to come back on her, that she felt very vulnerable."
[5] S.M., as to whom parental ties were not severed, but who was found CINA and ordered to remain in State custody, does not contest the termination order as to J.M.; nor does she challenge her own CINA adjudication or her custodial disposition. The only issue raised by S.M. is a tangential one: the propriety of an order denying a peremptory challenge of Judge Greene that was filed shortly before trial by S.M.'s appointed counsel. However, in the absence of any challenge to the merits of S.M.'s adjudication or disposition, or any claim of other potential prejudice, the point is moot. We thus do not address it.
[6] A trial court's findings are clearly erroneous if a review of the entire record leaves this court with a definite and firm conviction that a mistake has been made. In re S.A., 912 P.2d at 1237.
[7] The full text of AS 47.10.010(a)(2)(A)-(F)  now AS 47.10.010(a)(1)-(b), see supra note 1  states:

(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor
....
(2) to be a child in need of aid as a result of
(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
(i) both parents
(ii) the surviving parent, or
(iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished;
(B) the child being in need of medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward others, and the child's parent, guardian, or custodian has knowingly failed to provide the treatment;
(C) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child;
(D) the child having been, or being in imminent and substantial danger of being, sexually abused either by the child's parent, guardian, or custodian, or as a result of conditions created by the child's parent, guardian, or custodian, or by the failure of the parent, guardian, or custodian adequately to supervise the child;
(E) the child committing delinquent acts as a result of pressure, guidance, or approval from the child's parents, guardian, or custodian;
(F) the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian.
[8] Webster's New World Dictionary, 6, 851-52 (2d ed. 1980).
[9] Neither "abuse" nor "neglect" is defined in the context of Alaska's CINA statute. But the commonly understood distinction between passively and actively inflicted harms is reflected in Alaska's Child Protection Act, AS 47.17., which defines "neglect" to mean "the failure by a person responsible for the child's welfare to provide necessary food, care, clothing, shelter, or medical attention for a child." AS 47.17.290(10).

The distinction is also reflected in Alaska's Protection of Vulnerable Adults Act, AS 47.24., which defines both "abuse" and "neglect." "Abuse" is defined, in relevant part, to mean "the wilful, intentional, or reckless nonaccidental, and nontherapeutic infliction of physical pain, injury, or mental distress," AS 47.24.900(2)(A); "neglect" is defined to mean "the intentional failure by a caregiver to provide essential care or services necessary to maintain the physical and mental health of the vulnerable adult." AS 47.24.900(9).
This same distinction is embedded in Alaska's criminal code. Thus, AS 11.81.600(a) specifies that "[t]he minimal requirement for criminal liability is the performance by a person of conduct that includes a voluntary act or the omission to perform an act that the person is capable of performing." In turn, AS 11.81.900(b)(59) and (38) define "voluntary act" to mean "a bodily movement performed consciously as a result of effort and determination[,]" and "omission" to mean "a failure to perform an act for which a duty of performance is imposed by law."
[10] For example, a parent driving a car with a child passenger who is not strapped into a child restraint may be blamed either for committing an act of neglect by failing to secure the child safely or for committing an act of abuse by driving the child without a proper restraining device. The potential harm to the child is the same regardless of which label attaches.
[11] The State points to no other law that hinges the State's duty to protect a person from a given harm on the fortuitous circumstance of whether that harm is occasioned by abuse or by neglect. And we are aware of no such law.
[12] To shore up its argument, the State points to our recent decision in D.H. v. State, 929 P.2d 650 (Alaska 1996), a termination of parental rights case prosecuted under subsection (F), where we commented in a footnote: "As the statute and this court's treatment of it make abundantly clear, however, the superior court is not meant to confine its inquiry to the physical well-being of the child." Id. at 653 n. 10. The State reads this comment to say that "neglect" under subsection (F) means something more than physical neglect. Closer scrutiny, however, belies this reading. When viewed in context, our footnoted mention of "the statute and this court's treatment of it," id., plainly referred to the CINA statute as a whole, not just to subsection (F), since the footnote itself related to our discussion in the opinion's text of a proposition articulated in In re J.L.F. & K.W.F., 912 P.2d 1255, 1261 (Alaska 1996). J.L.F. & K.W.F. involved a CINA adjudication under subsection (A), not subsection (F). J.L.F. & K.W.F., 912 P.2d at 1257-58. Moreover, the footnoted comment stands at most for the proposition that the physical well-being of a child at any given time cannot be determinative of whether the child has suffered substantial abuse or neglect. This proposition holds true whether the alleged abuse or neglect is physical or nonphysical. Thus, our footnoted comment says nothing about whether "neglect" under subsection (F) covers something more than substantial physical neglect.
[13] The dissent also suggests that Chapter 17 definitions of neglect should be imported to subsection (F) of the CINA statutes because the legislature did not see fit to define "neglect" in Chapter 10, and thus likely thought "that the term should be applied and defined [] consistently" in both chapters. This argument does not bear up to scrutiny.

Apart from its appearance in AS 47.10.010(a)(2)(F), the word "neglect" is used in only five provisions of Chapter 10. See AS 47.10.142(a)(2) and (3); AS 47.10.310(c)(4); AS 47.10.340(2); AS 47.10.394(b); and AS 47.10.396(2). Four of these five provisions use "neglect" within the phrase "child abuse or neglect." AS 47.10.310(c)(4)(A); AS 47.10.340(2); AS 47.10.394(b)(1); and AS 47.10.396(2). Two of these four specifically define this phrase in accordance with its definition in AS 47.17.290. AS 47.10.310(c)(4)(B); AS 47.10.394(b)(2). The two provisions that do not define the phrase by reference to chapter 17 have no need to define it, since they deal with confidentiality of records generated in proceedings conducted under the two corresponding provisions which adopt the Chapter 17 definition. AS 47.10.340(2); AS 47.10.396(2). The only other Chapter 10 appearance of "neglect" outside of subsection (F) is in AS 47.10.142, which, as we have seen, expressly defines "grossly neglected" by reference to Chapter 17's definition of "neglect."
These provisions directly undermine the dissent's theory of a general legislative intent to rely on chapter 17's definition of "neglect" as a default definition for Chapter 10. The foregoing summary demonstrates the legislature's ability and willingness to include specific references to Chapter 17 definitions of "neglect" or "child abuse or neglect" in all instances when those definitions are called for. The most plausible explanation for the legislature's failure to provide a definition of "neglect" in subsection (F) thus appears to be its belief that, in the context of a provision requiring substantial physical neglect, the word required no further definition.
[14] S.M.'s situation differs from J.M.'s. As we have already mentioned, despite finding grounds for termination of parental rights under subsection (F) as to S.M., the trial court determined that termination would not be in S.M.'s best interests; accordingly, the court continued S.M. in State CINA custody but did not terminate R.J.M.'s or P.M.'s parental rights. Moreover, in addition to finding clear and convincing evidence of CINA status under subsection (F), the trial court relied on evidence of S.M.'s past sexual abuse by R.J.M. to find that probable cause existed to adjudicate S.M. CINA under subsection (D) (allowing CINA adjudication for past or imminent sexual abuse by parent). Although the trial court declined to find clear and convincing evidence of sexual abuse, its finding by a preponderance of evidence suffices as an independent ground for a CINA adjudication of S.M. under subsection (D), at least as to R.J.M.

S.M. does not contest her CINA adjudication or her placement in State custody. While P.M. argues that the trial court erred in relying on emotional neglect as a basis for termination of her parental rights under subsection (F) and that the State failed to produce sufficient evidence to warrant termination, she does not contest S.M.'s CINA adjudication as such. R.J.M. challenges the termination order and raises a number of additional procedural issues; but he, too, fails to contest the trial court's CINA determination under subsection (D) as to S.M. The trial court's misapplication of subsection (F) thus has no direct bearing on the validity of S.M.'s current CINA status.
[15] In accordance with CINA Rule 15(g), the trial court expressly found that the State had made reasonable efforts to eliminate the need for removal of the children from the parental home. R.J.M. disputes the sufficiency of the trial court's finding. CINA Rule 15(g) requires only that the superior court consider and evaluate the reasonableness of the State's efforts to avoid removal; the rule "does not require that each element of the `reasonable efforts' be discussed individually and in detail." R.R. v. State, 919 P.2d 754, 756 (Alaska 1996). We conclude that the superior court's CINA Rule 15(g) findings are sufficient as to both R.J.M. and P.M.
[16] Under AS 47.10.080(c)(1), a minor may be placed in CINA custody for an initial period of two years, subject to a two-year extension upon further petition and hearing.
[17] CINA Rule 19(e)(4) provides:

If the court is unable to decide the extension petition before expiration of the existing disposition order, the court may extend custody or supervision for a reasonable time pending a decision on the extension petition.
[1] For the sake of consistency with the opinions of this court and the superior court in this case, and with previous opinions of this court discussing the CINA statute, I refer to the subsections of AS 47.10.010 as they were numbered before amendment in 1996. For example, AS 47.10.010(a)(2)(A) is now AS 47.10.010(a)(1), and AS 47.10.010(a)(2)(F) is now AS 47.10.010(a)(6).
[2] The court's summary of subsections (a)(2)(B) through (a)(2)(F) was dicta. It was not necessary to decide the question presented here, nor did the court do so.
[3] See 1 Thomas A. Jacobs, Children and the Law: Rights & Obligations § 2:18 (1995); Vincent J. Fontana and Douglas J. Besharov, The Maltreated Child (4th ed. 1979).
[4] Of course, the legislature might have thought that emotional neglect was in some way covered by AS 47.10.010(a)(2)(A), but if so, one would think the legislature also would have thought that physical neglect would have been covered by that same subsection. If that is how the legislature reasoned, there would have been no reason for it to amend subsection (a)(2) by adding subsection (F) in 1982.
[5] As a syntactical model, the court relies on repeated references in AS 47.10 to the phrase "child abuse or neglect," and reasons that the legislature obviously intended "child" to modify both "abuse" and "neglect." Maj. op. at 862. I find the model unpersuasive. Given the title of chapter 10, "Delinquent Minors and Children in Need of Aid," that reading is the only reasonable reading of that phrase consistent with context. In comparison, context does not compel a conclusion that the court's reading of the phrase "substantial physical abuse or neglect" is the only logical, permissible reading.
[6] The court expresses concern that mere "substantial neglect" could justify termination of parental rights under AS 47.10.010(a)(2)(F). Maj. op. at 866. Actually, termination of parental rights requires proof of substantial neglect by the clear and convincing evidence standard. AS 47.10.080(b)(3). Further, an objection that "substantial" is not sufficiently harmful to justify CINA jurisdiction (or termination of parental rights) is equally applicable to "substantial physical neglect," (the reading the court favors). There is no dispute that the legislature approved the "substantial" standard of harm for both jurisdiction and termination.
[7] The court also rejects the State's reliance on D.H. v. State, 929 P.2d 650 (Alaska 1996), where we commented: "As the statute and this court's treatment of it make abundantly clear, however, the superior court is not meant to confine its inquiry to the physical well-being of the child." Id. at 653 n. 10. Maj. op. at 866 n. 12. Taken at face value, the D.H. comment supports a conclusion that the court can also look into the child's emotional well-being. Footnote 10 was attached to the court's discussion of AS 47.10.010(a)(2)(F), the same subsection at issue here, and was made in context of a superior court finding that D.H. had neglected T.H. since her birth. "There [have] been no real bonding efforts on [D.H.]'s part and no significant nurturing has taken place...." 929 P.2d at 653. We held that the superior court did not clearly err in determining that D.H. "substantially neglected" her daughter. Id. at 654. In holding for the State, we quoted its argument that the mother failed to make any sustained effort "to establish a parent-child relationship with [T.H.] by remaining available for her daily care." Id. at 653. I read the D.H. footnote to shed light on subsection (a)(2)(F), given the factual context and the specific issue D.H. was arguing. Moreover, the subsection (a)(2)(F) issue in D.H. is best characterized as involving a claim that the mother had emotionally neglected her child. Consequently, I do not regard the quoted language as inapplicable here. In any event, the actual holding of D.H. on the subsection (a)(2)(F) issue is illustrative of the result I would reach in this case.

I am also unpersuaded by the court's willingness to give more credence to brief dicta originating in S.A. (which did not raise or turn on a subsection (a)(2)(F) issue) than to the holding of D.H. (which did). Compare Maj. op. at 864-865 with Maj. op. at 866 n. 12.
[8] See In re S.A., 912 P.2d 1235, 1241 (Alaska 1996), discussing A.M. v. State, 891 P.2d 815 (Alaska 1995); In re T.W.R., 887 P.2d 941 (Alaska 1994); F.T. v. State, 862 P.2d 857 (Alaska 1993); In re J.L.F., 828 P.2d 166 (Alaska 1992), and overruling A.M., T.W.R., and J.L.F. to the limited extent they stated that the ability to care may be considered under subsection (a)(2)(A).